*E-FILED: January 20, 2012*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROANE HOLMAN; NARCISCO NAVARRO HERNANDEZ; MIGUEL A. ALVAREZ; and all other similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>    Defendant. | No. C11-00180 CW<br><br>**ORDER ON (1) DISCOVERY DISPUTE JOINT REPORT #1 AND (2) ADMINISTRATIVE MOTION TO FILE UNDER SEAL**<br><br>**[Docket Nos. 48 and 60]** |

INTRODUCTION

In September 2007, the Ninth Circuit issued an opinion in Pintos v. Pacific Creditors Ass'n, 504 F. 3d 792 (9th Cir. 2007).[1] It made new law by deciding that the Fair Credit Reporting Act (FCRA), 15 USC sec. 1681 et seq., does not permit a collection agency to use a consumer credit report to collect a non-consensual debt (such as the charge for towing an automobile where the consumer had not ordered the tow). This was important because credit reporting companies such as Experian are statutorily required to make efforts to verify that consumer credit reports they furnish to collection agencies are not used for impermissible purposes.

---

[1] This opinion was subsequently withdrawn and superceded by an opinion at 565 F. 3d 1106 (9th Cir. 2009), which was in turn amended and superceded by 605 F. 3d 665 (2010). The holding described above remained the same. Certiorari was denied at 131 S.Ct. 900 (2011).

1    This putative class action arises because, after Pintos was decided, Experian signed up a
2 new subscriber, a collection agency called Finex, and proceeded—allegedly—to furnish Finex
3 with thousands of credit reports for its use in collecting on non-consensual towing claims.  In
4 doing so, plaintiffs claim, Experian violated its "verification" obligation under the FCRA.

5    The dispute presently before this court is whether certain documents produced by
6 Experian in discovery with the designation "Confidential" should remain confidential or,
7 instead, be de-designated and therefore made available to the public.  Meet-and-confer efforts
8 between the parties were only partially successful, and they eventually agreed to disagree about
9 the handful of documents that became the subject of Experian's Motion to Retain
10 Confidentiality of Designated Documents.  The motion was referred to this court.  Under this
11 court's Standing Order on Discovery Disputes, the parties submitted a Discovery Dispute Joint
12 Report (DDJR).  The court has considered the DDJR; read the Declaration of Kathy Centanni,
13 Experian's Director of Regulatory Compliance, submitted in support of continuing the
14 Confidential designation ("Decl."); and reviewed the documents themselves which were
15 included as Exhibits to the Centanni declaration.  The matter is suitable for decision without
16 further briefing or a hearing.  CIV. L.R. 7-1(b).

## DISCUSSION

18    The issue here is not whether plaintiffs shall have access to and use of the documents for
19 this litigation.  They have them.  The question is whether the court should remove the
20 Confidential designation and allow plaintiffs to disclose them publicly or use them for whatever
21 purpose they wish.

22    The parties agreed to a Stipulated Protective Order (SPO) which specifies, in assessing
23 whether a document may properly be designated as Confidential, to look to Fed. R. Civ. P.
24 26(c).  Rule 26(c) says that the court may, for good cause shown, issue an order to protect a
25 party against "annoyance, embarrassment, oppression, or undue burden or expense" by denying
26 or limiting access to "a trade secret or other confidential research, development, or commercial
27 information."  Experian has the burden of proving "good cause" for continuation of the
28 Confidential designation on the documents in dispute (SPO, ¶ 6.3).  "Good cause" requires a

showing that specific prejudice or particularized harm will result if the Confidential designation is not maintained on the documents in question. In re Roman Catholic Archbishop of Portland, 661 F.3d 417, 424 (9th Cir. 2011).

### 1. Internal Documents About the Pintos Decision

Three "sets" of disputed documents relate to Experian's communications, mostly with sales and marketing staff, about Pintos.

Exhibit 1 (EIS Nos. 4-7): These are four single-page documents that Experian distributed to its sales personnel offering an update on the then-current status of the Pintos litigation and suggesting talking points about Experian's "position." They are dated October 2007, May 2009, June 2010, and January 2011.

Exhibit 2 (EIS Nos. 8-9): An undated two-page "bulletin" distributed to eight organizational groups within Experian (sales and marketing functions) updating on the Pintos litigation. It sets a deadline of July 1, 2011 to contact clients for described purposes.

Exhibit 3 (EIS Nos. 10-13): An internal copy of a "letter," undated, regarding the Pintos decision which, according to Centanni's declaration, " may have been distributed on a confidential basis to Experian's subscribers," but was "never disclosed publicly." (Decl. ¶ 7).

### 2. Agreements Between Experian and Finex

Exhibit 4 (EIS nos. 14-17): These are the boiler plate Experian Standard Terms and Conditions contract with Finex (2 pages), including an Experian Consumer Services Schedule (1 page) and an Experian Reference Services Schedule (1 page), all "effective" January 31. 2008.

Exhibit 5 (EIS Nos. 127-128): An undated Experian Data Release Agreement wherein Finex agreed to provide "data" to Experian "pertaining to individuals with whom it has a credit relationship . . . ."

### 3. Documents Establishing Finex as a New Experian Subscriber

Exhibit 6 (EIS Nos. 44-45): This is a completed check list form describing a site inspection performed at the Finex business premises by a third party provider.

1   Exhibit 7 (EIS Nos.148-153):   Spread sheets comprising a log maintained by Experian
2   of contacts with Finex, October 23, 2007 through January 31, 2008.

3   Exhibit 8 (EIS No. 125):   A Subscriber Questionnaire Document filled out about Finex.

4   Exhibit 9 (EIS No. 126):   A Data Reporting Membership Application filled out and
5   signed by Finex, dated December 20, 2007.

6   Exhibit 10 (EIS No. 130-131): A Membership Application filled out and signed by
7   Finex, dated January 28, 2008.

8   Exhibit 11 (EIS Nos. 132-133):  Two single-page documents prepared by "Experian
9   Membership" on Finex entitled Customer Profile.  The information on both appears to be
10  identical but for a different "Branch/dba Name."

11   4.   Notice of FCRA Requirements

12   Exhibit 12 (EIS Nos. 154, 208):  Two single-page Experian documents entitled FCRA
13  Requirements, both dated July 15, 2002.  The wording on both documents appears to be
14  identical.  Centanni declares, without indicating any time frame, that a copy was "provided to
15  every new Experian subscriber in its membership materials . . . ." (Decl. ¶ 28).

16   Exhibit 13 (EIS No. 228):  A form captioned End User Certification of FCRA
17  Permissible Purpose: Collection.  Centanni declares that this form was sent to "certain
18  subscribers to complete after the final decision in Pintos to ensure FCRA compliance . . . ."
19  (Decl., ¶ 29).

20   Experian's argument for continuing the Confidential designation on the just-listed
21  documents can be capsulized as follows:  First, the documents really are confidential.  Second,
22  to allow release to the public would be a boon to Experian's competitors, who could pirate
23  Experian's forms, its customers, and its techniques for complying with the FRCA.  The court
24  will examine the arguments in turn.

25   First, confidentiality.  None of the documents were marked "confidential," except
26  apparently in conjunction with their production in this litigation.  None contain any text stating
27  their contents are confidential.  Centanni declares that "[c]ommunications between Experian
28  and its subscribers are confidential as part of Experian's services to the subscriber pursuant to

4

Experian's Standard Terms and Conditions. . . ." (Decl. at p. 6, lines 7-9).  She did not cite to any contractual language that established Experian's agreement of confidentiality.  Despite the poor photocopy, the dense thicket of boiler plate language, and font size that would challenge even a young person's eyesight, the court went looking.  Nowhere in the Standard Terms and Conditions, nor the "supplemental" Consumer Services Schedule and Reference Services Schedule, nor the Data Release Agreement did the court find any language that supported Centanni's assertion.  (There is language about both parties respecting the confidentiality of personal information of consumers (Standard Conditions, Ex. 4, ¶ 5), but that is beside the point.)  In the DDJR, Experian's lawyers make the same claim about a contractual obligation of confidentiality it has to its subscribers (p. 7, lines 20-22 and repeated at p. 10, lines 12-14), again with no citation to any evidence.  At one point, Centanni declares that certain of the documents were distributed to its subscribers "with the understanding the docments will be treated confidentially." (Decl., p. 6, line 19).  She offers no foundation for that statement, and, without foundation, the statement is worthless.  And, finally, having read each document, the court is not persuaded that any of them actually merit a conclusion that they are or should be deemed "confidential."[2]

What about the so-called competitive disadvantage that would flow from public release of the documents?  First, these documents are relatively old ("old news," argues the plaintiffs).[2] Nowhere does it appear that any of the form documents are still in use today.  No current business strategy is disclosed.  Indeed, to the extent any strategy is revealed, it is the steps Experian took (or, did not take) to comply with the new obligation, thanks to Pintos, of verifying that subscribers were not using credit reports for collecting off-limits towing debts.  It seems unlikely that a competitor would be interested, at this late date, in pirating how defendant dealt with Pintos.  As for the other documents, no pricing is revealed.  No method for gathering,

---

[2] Finex is out of business and, presumably, could care less about the "confidentiality" of its communications with Experian.

[2] Ms. Centanni herself said that " [t]he legal and regulatory landscape applicable to Experian and other credit reporting agencies is not static." (Decl p. 2, lines 11-12).

5

1  collating, organizing, accessing, or disseminating consumer credit data is revealed. No
2  information about "how" Experian goes about performing the various services it offers to
3  subscribers. The court sees nothing that looks like a trade secret or some unique or innovative
4  way to accomplish a task that competitors might themselves be interested in. In sum, it all
5  looks very ordinary. The court does not see specific prejudice or particularized harm.

6  The one document that might possibly offer a competitor an advantage is Exhibit 6, a
7  report done for Experian by a company that made an on site visit to Finex before it became a
8  subscriber. It looks like the report was intended to verify that Finex actually was a collection
9  agency, and this court's reading of it did not see any inquiry into what use Finex would make of
10 credit reports if Experian decided to furnish them. Nevertheless, Pintos obligations aside, the
11 court concludes that a competitor might glean something useful from Exhibit 6 for application
12 to its own business, and the court will maintain the Confidential designation.

13 Something might be said about the plaintiffs' stated reasons for wanting the documents
14 in question de-designated. They say the public is entitled to know about Experian's response to
15 Pintos. Some members of the public might be interested, but this does not seem to be a hot
16 topic of general public interest. They also say that taking depositions and filing documents with
17 the court is too complicated when dealing with documents subject to a protective order. True,
18 some additional steps are required, but they are hardly onerous; and, experienced counsel are
19 accustomed to dealing with them with minimal inconvenience. So, the articulated reasons for
20 de-designation are not weighty, but the burden of proof to maintain the designation is on
21 Experian, and it has not met that burden.

## CONCLUSION

The Motion to Retain Confidentiality of Designated Documents is GRANTED as to Exhibit 6 and otherwise DENIED. The Administrative Motion to File Under Seal Exhibits 1-13 is GRANTED as to Exhibit 6 and DENIED as to the rest.

SO ORDERED.

Dated: January 20, 2012

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

6

1  4:11-cv-00180-CW Notice has been electronically mailed to:

2  Andrew J. Ogilvie    andy@aoblawyers.com, carol@aoblawyers.com

3  Balam Osberto Letona    letonalaw@gmail.com

4  Daniel John McLoon    djmcloon@jonesday.com, cmcdaniel@jonesday.com

5  Mark F. Anderson    mark@aoblawyers.com

6  Mattia Victor Murawski    Mmurawski@jonesday.com, mecondos@jonesday.com

7  Michael Gregory Morgan    mgmorgan@jonesday.com

8  Sarah G Conway    sgconway@jonesday.com

9  Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.

**United States District Court**
For the Northern District of California